1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

9   United States of America,                    )   CR 10-1023-TUC-CKJ (DTF)
                                                  )
10             Plaintiff,                         )   **REPORT AND RECOMMENDATION**
                                                  )   **OF COMPETENCY**
11   vs.                                          )
                                                  )
12                                                )
     Victorino Enriquez-Cruz, Jr.,                )
13                                                )
               Defendant.                         )
14                                                )
                                                  )
15   _____)

16          Pursuant to a request by Defendant's counsel, the Court conducted a competency

17   proceeding. A hearing was held on October 10 and December 7, 2012, and January 11, 2013.

18   (Docs. 73, 85, 98.) Defendant was present and represented by counsel. This matter was taken

19   under advisement following the testimony, and the parties submitted post-hearing briefs.

20   (Docs. 107, 108.)

21          Having now considered the entirety of the record, including all written competency

22   evaluations, testimony and all exhibits, the Magistrate Judge recommends that the District

23   Court, after its independent review, find by a preponderance of the evidence that Defendant

24   is competent to proceed to trial.

25                                    **PROCEDURAL HISTORY**

26          The case before the Court has a long and circuitous history, which the Court considered

27   in reaching its findings.

28

On April 14, 2010, Defendant, Victorino Enriquez-Cruz, Jr., was arrested and charged in a criminal complaint with possession of methamphetamine with intent to distribute. (Doc. 1.) On the same date, attorney Roger H. Sigal was appointed to represent Defendant. (Doc. 3.) Thereafter, the grand jury returned a two count indictment charging Defendant with possession and importation of 8.2 kilograms of methamphetamine. (Doc. 4.)

The first trial date was set for July 20, 2010. (Doc. 6.) Defendant moved for a continuance because he required "more time for factual investigation, legal research, trial preparation, to obtain documenation [sic] which will assist defendent [sic] in deciding on how he wishes to proceed, and to review the possible courses of action with defendant." (Doc. 10.) This continuance and five subsequent requests were granted. (Docs. 11, 13-22.) Defense counsel argued in his various motions that because of the seriousness of the offense and the youthfulness of Defendant he was "leaving no stone unturned in determining what the best course of action for Defendant and in preparing this case for trial." (Doc. 19.) After the sixth motion to continue was granted, the case was referred to the assigned Magistrate Judge to ready the case for trial. (Doc. 23.)

The Magistrate Judge set a scheduling order for all pretrial motions. (Doc. 25.) No motions were filed by the deadline and the matter was set for a change of plea on May 5, 2011. On that date, Defendant failed to enter a plea. Additionally, Pretrial Services notified the Court that Defendant was not in compliance with his conditions of release and Defendant was remanded to custody. (Doc. 27.)

On the same day, Defendant filed his seventh motion to continue his trial for an additional 30 days. Defense counsel explained, "[s]ince the original plea offer was extended by the government in this case, counsel has been discussing with Defendant the risks and benefits of three alternative dispositions: trial, pleading guilty pursuant to the terms of the plea offer, and pleading straight up to the indictment." (Doc. 28.) Defense counsel revealed that he learned for the first time from Defendant's sister, Oliva Flores, that she believed Defendant to be retarded. (*Id.*) Defense counsel then asked Defendant to explain, "some of

1   the most basic concepts involved with pleading guilty," which counsel avers Defendant was
2   unable to describe. (*Id.*)

3       On May 25, 2011, Defense counsel moved for a psychological examination to
4   determine Defendant's competency for trial, which was granted on June 3, 2011. (Docs. 33,
5   35.) Dr. David Hermosillo-Romo evaluated Defendant and submitted his written evaluation
6   to the Court, in which he concluded Defendant was not competent to stand trial. (Doc. 47.)
7   After a September 26, 2011 status conference, the Court granted the Government's request
8   for an evaluation and treatment at a federal institution. (Docs. 43, 48-50).

9       Thereafter, Defendant was evaluated by Drs. Sarah Ralston, M.D., and Maureen L.
10  Reardon, Ph. D., ABPP, at the Federal Bureau of Prisons Medical Center, Butner, North
11  Carolina (FMC Butner). On April 10, 2012, the Court received the written certification that
12  Defendant was able to understand the nature and consequences of the proceedings against
13  him and to assist properly in his own defense. (Doc. 56.) Defendant was ordered returned to
14  the District of Arizona. (Doc. 58.)

15      Upon his return, Defendant moved to continue his competency hearing (Doc. 59) and
16  for the production of records, including Defendant's recorded telephone conversations and
17  test results from FMC Butner (Doc. 61). After time for briefing and a June 14, 2012 hearing,
18  the motion for discovery was granted. (Docs. 63-65.) An August 6, 2012 status hearing was
19  continued on joint request and the Court ordered for the second time that Dr.
20  Hermosillo-Romo produce the records regarding his competency evaluation. (Docs. 67, 68.)

21      After an additional requested continuance (Docs. 71, 72), the competency hearing
22  began on October 10, 2012, with the testimony of Dr. Sarah Ralston for the government, via
23  video-conference, and Dr. Hermosillo-Romo for the defense present in the courtroom. (Doc.
24  73.) Neither doctors' testimony was concluded and, after two additional continuances (Docs.
25  78, 80), the hearing resumed on December 7, 2012. (Doc. 80.) Dr. Ralston's testimony was
26  completed, but not Dr. Hermosillo-Romo's, and the hearing was rescheduled for January 11,

27

28

1    2013.[1] (Doc. 85.) On that date, Dr. Hermosillo-Romo finished his testimony and the defense

2    called Ms. Flores, Defendant's sister. (Doc. 100.) At the conclusion of the hearing, the parties

3    were directed to file any argument they deemed appropriate by February 8, 2013, which was

4    later extended to February 12, 2013, at Mr. Sigal's request. (Docs. 98, 105, 106, 111.)

5                           **COMPETENCY HEARING & DOCTORS' REPORTS**

6           Dr. Ralston graduated from University of North Carolina at Chapel Hill Medical

7    School, where she was inducted into Alpha Omega Alpha medical honors society. (RT

8    10/10/12 at 9.)[2] Dr. Ralston completed her residency in psychiatry and is employed as a

9    psychiatrist at FMC Butner. (*Id.* at 10.) Her current responsibilities include competency

10   evaluations of pretrial detainees. (*Id.* at 11.)

11          On April 10, 2012, the Court received the written Forensic Evaluation from FMC

12   Butner. (Doc. 56.) In that evaluation, Dr. Ralston acknowledged Defendant had significant

13   learning difficulties, but noted that he graduated from high school with grades that "ranged

14   from A's to D's." (*Id.* at 3.)  He received A's in his Junior Reserve Officers' Training Corps

15   classes, but later he failed to pass the required tests when he attempted to enlist in the Army.

16   (*Id.*)

17          Upon his admission to FMC Butner on November 7, 2011, Defendant underwent

18   physical examinations, laboratory testing, and mental status testing. He was placed on an

19   open mental health housing unit, and obtained a job where he accomplished his tasks

20   diligently, and was courteous and professional. During his interviews Defendant showed

21   occasional difficulty with English grammar and word choice. Defendant demonstrated an

22   ability to read and write and regularly attended the Competency Restoration Group, where

23   he was attentive to the lessons. (*Id.* at 5.)

24   _____

25          [1]    Dr. Ralston was recalled on January 11, 2013, for the sole purpose of providing

26   a foundation for her notes.

27          [2]    "RT" refers to the Reporter's Transcript of the October 10 and December 7,
     2012, and January 11, 2013 evidentiary hearing. (Docs. 86, 87, 103.) "Ex." refers to the

28   exhibits admitted at that hearing. (Docs. 74, 76, 101.)

1       Dr. Ralston also noted in her evaluation that Defendant was able to describe the

2   charges against him, the current status of his case, potential witnesses and their roles, and the

3   roles of the defense, prosecuting attorney, judge and jury.  He also showed an understanding

4   of the adversarial nature of trial and acknowledged that he should not talk to anyone about

5   his case without his attorney being present. He learned from his peers about less restrictive

6   options for incarceration, described to his father the consequence of a finding of

7   incompetence without restoration, and was also able to explain to his sister the best methods

8   for contacting his lawyer. (*Id.* at 6.) Based in part upon a battery of psychological testing, Dr.

9   Ralston found Defendant was malingering, had borderline intellectual function, no medical

10  problems, and a GAF of 65.[3] (*Id.* at 8.)

11      Dr. Ralston's testimony at the competency hearing was consistent with her Forensic

12  Evaluation that accompanied the Complex Warden's Certificate of Restoration of

13  Competency submitted to the Court on April 10, 2012. She explained that imbedded within

14  the cognitive testing was the ability to determine whether a person was attempting to falsely

15  portray themselves as less intelligent. (RT 10/10/12 at 29.) In her evaluation, Dr. Ralston

16  explained that Defendant's "performance on the TOMM . . . is significantly worse than

17  persons who have suffered a traumatic brain injury, dementia, aphasia, or other cognitive

18  disorder." (Doc. 56 at 8.) She concluded, "[t]his level of performance is consistent with low

19  effort to do well." (*Id.*)

20      In her testimony, Dr. Ralston discussed several occurrences that evidenced

21  malingering. During a recorded telephone conversation between Ms. Flores and Defendant

22  while he was at FMC Butner, Ms. Flores very pointedly told him not to allow the evaluators

23  at Butner to manipulate him to believe he is competent. She told him not to listen to what

24  _____

25      [3]  The GAF is a 100-point scale that measures a person's overall level of
    psychological, social and occupational functioning on a hypothetical continuum. *See*
26  *American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (*"DSM*
    *IV"*), at 32, 34 (4th ed. 2000).  Lower numbers indicate more severe symptoms.  A rating of
27  61 to 70 indicates mild symptoms or "some difficulty in social, occupational, or school
    functioning . . . but generally functioning pretty well." *Id*. at 34.
28

they were telling him. (RT 10/10/12 at 38-39; Gov't Ex. 3.) Defendant related to Dr. Ralston that he told his father if he were found incompetent he would undergo a dangerousness hearing and be released. (RT 10/10/12 at 39-40.) His father told him that it would be best for him to be found incompetent, because he would not go to trial. (*Id.*)

Dr. Ralston also related observations of Defendant by herself and the FMC Butner staff that were inconsistent with the intellectual capacity Defendant portrayed in the test results. Defendant maintained good hygiene and dressed appropriately, which is different from many of the patients at the facility. (*Id.* at 30.) He also maintained work at the institution, receiving a promotion to a higher level than most individuals who are pretrial detainees. (*Id.* at 31.) Defendant was commended by his supervisors as an exemplary employee who mentored others and demonstrated a good work ethic. (*Id.* at 32.) Dr. Ralston testified that, to a reasonable degree of certainty in the field of psychiatry, Defendant was competent to stand trial. (*Id.* at 40.)

Dr. Hermosillo-Romo is a clinical psychologist with training and experience in neuropsychology. (RT 10/10/12 at 75-76). He has developed a specialty with respect to evaluating individuals with cognitive deficits. (*Id*. at 76.) Dr. Hermosillo-Romo helped develop the first neuropsychological test battery in Spanish and is a published author in his field. (*Id.* at 78.) According to Dr. Hermosillo-Romo, he has conducted about 20 competency evaluations for State and Federal courts. (*Id.* at 79.)

Dr. Hermosillo-Romo met with Defendant in person on July 19, 2011, to conduct his evaluation, which lasted "[n]o more than four hours." (*Id.* at 82.) During this period his evaluation consisted of a background interview, basic mental status examination and a competency examination. (*Id.* at 83.) Additionally, he administered a reading comprehension test, test of memory malingering, a mini mental state examination, the Wechsler abbreviated scale of intelligence and two sub tests: the digit span and digit symbol. (*Id.* at 84-85.)

In Dr. Hermosillo-Romo's written Adjudicative Competence Evaluation, he found Defendant had a "mild form of mental retardation." (Doc. 47 at 2.) He opined Defendant had "moderate to severe deficits in adaptive behavior," and a fourth grade reading level. (*Id*.)

1   Based upon information Dr. Hermosillo-Romo received from Defendant's sister, Oliva

2   Flores, he wrote that Defendant lacked the ability to "independently initiate or maintain basic

3   grooming, hygiene or health habits" and was chronically unable to maintain employment or

4   support himself for independent living. (*Id.*; *see also* RT 12/7/12 at 64-65; RT 1/11/13 at 11,

5   14.)

6          Dr. Hermosillo-Romo testified that, during his interview with Defendant, he found

7   Defendant was unable to discuss the concept of plea bargaining or the function and purpose

8   of the legal participants in a trial, and he was unable to talk about the "appraisal of legal

9   defenses, that is, the type of basic pleas one can make in court and the legal implications of

10  the legal pleas." (RT 10/10/12 at 89.) The doctor also found Defendant was unable to

11  "cooperate or work rationally with his defense attorney, to work rationally towards his own

12  defense." (*Id.* at 89-90.)

13         As part of his evaluation, Dr. Hermosillo-Romo interviewed Oliva Flores, by

14  telephone, for about one hour. (RT 1/11/13 at 12.) During his testimony, Dr. Hermosillo-

15  Romo acknowledged that malingering can arise from family members. (*Id.* at 13.) He also

16  acknowledged that he did not verify any of the information he received from Ms. Flores to

17  assess whether she was exaggerating to help her brother. (*Id.* at 14, 18, 20.) Rather, he just

18  accepted her statements. (*Id.* at 18.) Dr. Hermosillo-Romo indicated that he was unfamiliar

19  with the statements attributed to Ms. Flores in Defendant's first Pretrial Services Report

20  (PTSR). (*Id.* at 14-15.)

21         Defendant provided the following personal history to a Pretrial Services officer on the

22  date of his arrest.

23         The defendant, age 23, states he was born and raised in Puebla, Mexico. The
       defendant indicates at the age of 15 he became a United States citizen and

24     lived with his mother in Long Beach, California for five years before
       relocating to Tucson where he has remained. The defendant informs he has

25     been living alone at the above-listed address for the past three years. He adds,
       the home is owned by his father and he pays his father rent.

26
           The defendant informs he is one of three children born to Mirice Enriquez and

27     Victorino Enriquez. The defendant states his parents divorced when he was
       seven years old. He adds, his sister, age 28, lives in Las Vegas, Nevada, and

28

1    his 30-year-old sister resides in Tucson. The defendant conveys he maintain
     regular contact with his siblings and parents.
2
     The defendant advises he has been in an amicable relationship with his fiancee,
3    Anaice Moreno, for the past month. He informs he has no children.

4    The defendant advises he completed his high school education.

5    Regarding travel, the defendant states he travels to Mexico two to three times
     a month for vacation purposes. The defendant states he has a valid passport
6    and agents have possession of his passport.

7    (Doc. 36 at 1-2.) In the PTSR, Ms. Flores is reported to have "corroborated personal history

8    information regarding the defendant's residence, community ties, family ties, and travel. Ms.

9    Flores indicated Defendant lived with their father who is a truck driver and spends most of

10   his time on the road. She added, her father stays with her brother when he is in town. She

11   indicated Defendant is welcomed to return home if released." (*Id.* at 2.) Defendant told the

12   interviewing officer that he had been working for Arizona Steel as a driver for the past two

13   years. The report indicated Ms. Flores "confirmed this information." (*Id.*)

14       When presented the information contained in the PTSR, Dr. Hermosillo-Romo

15   acknowledged that Ms. Flores had provided different information to him and that he would

16   have wanted to know this information before he reached his conclusions in the case. (RT

17   1/11/13 at 16-17, 19, 44.) Similarly, Dr. Hermosillo-Romo agreed that some of the

18   information he learned about Defendant's performance while at FMC Butner was different

19   from Ms. Flores's description of Defendant's abilities. (*Id.* at 43, 45.)

20       After Dr. Hermosillo-Romo heard the description of Defendant's conversations with

21   his father and Ms. Flores, who had both urged him "not to be found competent," he expressed

22   his belief that Defendant would have been  influenced by them. (*Id.* at 19.) Ultimately, Dr.

23   Hermosillo-Romo fully agreed with Dr. Ralston's statement that Defendant "deliberately

24   suppressed correct answer choices; instead chose incorrect answer." (*Id.* at 29; *see also*

25   12/7/12 at 58.)

26       Dr. Hermosillo-Romo concluded his testimony by acknowledging that in his opinion

27   Defendant's view of the system was "more juvenile than anything else because of his IQ."

28   (RT 1/11/13 at 103.) According to Dr. Hermosillo-Romo, after hearing all of the testimony

1    he believed it was a possibility for defense counsel to sufficiently educate Defendant about

2    the legal system so Defendant could understand what was going on, make decisions and aid

3    his lawyer. (*Id.* at 104.)

4           Oliva Flores also testified on January 11, 2013.  During her testimony she attempted

5    to explain that the telephone conversation she had with Defendant was related to his question

6    whether he would be credited for his time at FMC Butner, not that she was coaching him to

7    be found incompetent. (*Id.* at 126, 128.) The recorded telephone conversation between

8    Defendant and Ms. Flores shows otherwise. (Gov't Ex. 3.) Also, Ms. Flores's manner of

9    answering questions during cross-examination was markedly different than on direct.

10   Eventually, the Court, *sua sponte*, admonished Ms. Flores to answer the prosecutor's

11   questions. (RT 1/11/13 at 146-47.) The Court ascribes little weight to Ms. Flores' testimony,

12   finding her performance unconvincing.

13                                    **DISCUSSION**

14          A defendant's right not to stand trial while incompetent is rooted in his constitutional

15   right to due process.  *See Maxwell v. Roe*, 606 F.3d 561, 564 (9th Cir. 2010.) The defendant's

16   ability to understand the proceedings and participate in the defense is considered

17   "fundamental to an adversary system of Justice." *Dusky v. United States*, 362 U.S. 402

18   (1960) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). The standard for competency

19   is whether the defendant has "sufficient present ability to consult with his lawyer with a

20   reasonable degree of rational understanding . . . [and] a rational as well as factual

21   understanding of the proceedings against him." *Torres v. Prunty*, 223 F.3d 1103, 1106 (9th

22   Cir. 2000) (quoting *Dusky*, 362 U.S. 402); *Maxwell*, 606 F.3d 561; 18 U.S.C. § 4241(d). The

23   Government has the burden of demonstrating by a preponderance of the evidence that the

24   defendant is competent to stand trial. *United States v. Frank*, 956 F.2d 872, 875 (9th Cir.

25   1992).

26          The record in this case preponderates that Defendant is competent to stand trial and

27   assist counsel in his defense. Dr. Ralston's opinion that Defendant is competent is supported

28   by the battery of testing she conducted and Defendant's behavior at FMC Butner.

                                         - 9 -

1   Defendant's poor performance on some of the tests is explained by his clear effort to

2   malinger, as encouraged by his sister. Dr. Hermosillo-Romo's evaluation relied extensively

3   on information from Ms. Flores, and he had to formulate his opinion based on a singular

4   contact that occurred prior to Defendant's treatment at FMC Butner.

5          Defendant's lawyer had been communicating with him for more than a year without

6   concern about Defendant's competency or understanding of the proceedings. A question

7   about Defendant's comprehension was first raised by his sister, Oliva Flores, after she

8   discussed with him whether to accept a plea agreement or go to trial. Ms. Flores provided a

9   significant portion of the information about Defendant's abilities upon which Dr. Hermosillo-

10  Romo relied in finding Defendant not competent – that he did not maintain personal

11  grooming or health without guidance and could not sustain employment or independent

12  living. The doctor noted that interviewing Ms. Flores was necessary because Defendant had

13  been unable to provide the background information he needed to complete his evaluation.

14  (Doc. 47 at 3.) The impression left with Dr. Hermosillo-Romo was in significant contrast to

15  Defendant's ability to provide his personal history to Pretrial Services when being evaluated

16  for release. His sister confirmed the information in the PTSR, which stated that Defendant

17  had been living primarily alone for the previous three years, paying rent to his father, and had

18  been working for the same employer for the two years prior to his arrest. (Doc. 36 at 1-2.)

19         The information provided by Ms. Flores to Dr. Hermosillo-Romo was also in stark

20  contrast to Defendant's behavior at FMC Butner. He excelled there, maintaining his hygiene

21  and receiving a promotion and commendation from his employers. (RT 10/10/12 at 30-32.)

22  Critically, Defendant was able to describe central players in the criminal justice system and

23  the adversarial nature of trial. He knew the status of his case and the importance of keeping

24  information about it confidential. (Doc. 56 at 6.)

25         After Dr. Hermosillo-Romo listened to Dr. Ralston's testimony and learned additional

26  information about Defendant, he opined that it was a possible for defense counsel to educate

27  Defendant about the legal system so Defendant could understand what was going on, make

28  decisions and aid his lawyer. (RT 1/11/13 at 103-04.) Indeed, this process had already been

1   completed at FMC Butner. For these reasons, the Court finds that the Government has

2   established by a preponderance of the evidence that Defendant is able to consult with his

3   attorney with understanding and comprehends the proceedings against him such that he is

4   competent to stand trial.

5                                    **RECOMMENDATION**

6           In view of the foregoing, it is recommended that, after its independent review of the

7   record, the District Court FIND, by a preponderance of the evidence, that Defendant is

8   competent to proceed to trial. Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any

9   party may serve and file written objections within 14 days of being served with a copy of this

10  Report and Recommendation. A party may respond to the other party's objections within

11  fourteen days. No reply brief shall be filed on objections unless leave is granted by the

12  district court. If objections are not timely filed, they may be deemed waived.

13          DATED this 22nd day of February, 2013.

14

15

16

17

18  _____

19                  D. Thomas Ferraro
                    United States Magistrate Judge

20

21

22

23

24

25

26

27

28